Before we begin our official business for today, I will turn to Judge Clevenger for a motion. Thank you. I actually have two motions. I'm going to make them together. I move the admissions of the bar of this court of Stephanie Baer and Timothy Tin Ming Lau. Both are members of the bar and are in good standing in the past courts of the jurisdictions. In Stephanie's case, Massachusetts, the Commonwealth of Massachusetts, and in Tim's case, the great state of California. I have knowledge of their credentials, and I'm satisfied they possess the necessary qualifications. I can say that because both of these individuals have served for the last year as law clerks in my chambers. Both have served with great distinction and have been a great help to me and to the court. And so I'm very confident that they do have the skills and the character required for membership in our bar. And if the panel sees fit to grant my motion, I'll look forward to them appearing in front of us in the future. Well, I pleasantly and enthusiastically grant this motion. I've had the pleasure of encountering these two fine young people during my experience because of our work with Judge Clevenger. So the motion is granted, and please step forward to be sworn in. Raise your right hand. Do each of you solemnly swear that you will report yourself as an attorney and counsel to this court, by right and affording it all, in the name of the support of the Constitution of the United States of America? I do. Do you mind, Judge? Welcome to the bar. Congratulations. Our first case this morning is 14-1051, Michael Storrs, Inc. v. U.S. Mr. Knisely, I know you're ready. Good morning, Your Honors. May it please the Court, I'm Matt Knisely of Hughes, Hubbard & Reed, appearing today on behalf of Michael Storrs. This case involves a relatively straightforward issue of regulatory construction. Can I ask a procedural question before you get going? The first one is the question of whether or not there's any confidentiality problems we have in this case. The opinion that we got said it was filed under seal. And then in your brief, there is many, many places in which you've put brackets around material, which is the ordinary way in our court of signaling that you believe it's confidential. But there's no label on the brief, and I didn't know that you've requested any confidentiality. So are there any restrictions on what we say in court or what we can write in an opinion? It was, I apologize if there's a lack of an indication on the front of the brief, but our expectation was that there wouldn't be a need to talk about proprietary information during the oral argument today. But I mean, I'm puzzled about what proprietary information is. For example, some of this seems to me to be hardly confidential. Are all the bracketed matters? Some of the information, Your Honor. How am I supposed to know? I mean, am I supposed to have remembered all the bracketed material? I'm not supposed to talk about, for example, on page four at the bottom, the last two sentences are bracketed. Can we take this off this time? Yes. And we're going to reset the clock. Would you mind doing that? We'll add it. Why don't we stop the clock? Yes. Some of the information was deemed confidential to Michael. Some of it was obtained under the APO. For instance, some of the ‑‑ I mean, for example, on page six, the last sentence, none of the entries of the issue were subject to an administrative review. That's confidential? With regard to ‑‑ I think that's because ‑‑ Maybe it would be advanced, the argument here, if it's okay with the Chief Judge. If you feel there's something that we couldn't write in an opinion, maybe you tell us that by the ‑‑ what day is today? Tuesday? Close of business Thursday? You write us a letter and tell us what it is or get to go to the other side? That would be problematic. If I can talk in open court, then why can't it be in an opinion? Fair enough. I understand. I'd be happy to do that. And the second question is, what's the impact of this case going to be on these other pending cases that deal with ministerial implementation of the customs instructions? In our view, Your Honor, if the court were to agree with our construction of what we think is the plain meaning of the regulation, then by definition ‑‑ You're going to win those cases. I'm sorry? You're going to win those cases. That's right. But it isn't that there's some subject matter here that will affect some different but related subject matter in the other cases? That's right. Okay. Okay. So back to the regulatory construction issue. The government would have you believe this case represents Commerce's standard application of its non‑market economy anti‑dumping policy. But the problem is that Commerce never bothered to amend its regulations sufficiently to implement that policy. At issue here is ‑‑ Well, they won't need to amend their regulations. We agree with them. We agree with the government's interpretation of the regulation. That's correct. And this is your argument that you have to do with APA. You've got to go have notice and comment rulemaking to amend the regulation. That's right. Right. But it's a total non‑starter, dog won't hunt argument if we agree with the government. If you agree with the government's interpretation, that's correct. Our view is that the government ‑‑ If we agree with your interpretation, they'll have to go back and rewrite the regulations. That's right. Good. That's right. What's your next argument? What's our next argument? Yeah, well, that one didn't go anywhere for me because it was circular. Because it was? Circular. I mean, the argument, oh, my goodness, they're amending the regulation. Well, either they are or they aren't. If we agree with them, then the regulation doesn't need amending. If we agree with you, it needs to be amended. So ‑‑ Your Honor, if it needs to be amended, that means that it's a time that it was relied upon by our client. Right. But let's say, for example, I agree with the government. That basically what it is, the countrywide rate, is a non‑combination rate for purposes of the regulation. If you agree with them that that is a non‑combination. Then you lose. You lose. And they don't need to amend the regulation. I mean, you can try to get them to amend the regulation, but they don't need to. Your Honor, I agree. I agree. The problem is that we think the plain meaning of the regulation shows that that's a non‑combination rate is not the countrywide rate that's talked about in Part D. Well, does your argument rest on the fact that you're talking about the regulation exclusively, are you not, with respect to as if it only included B2 and it compels us to ignore subsection D in its entirety? I don't think it compels you to ignore subsection D entirely. What I think it does is it requires you to consider how they function together. And in our view, the plain language is that B2 talks about what ought to happen when an exporter doesn't have its own rate, but the producer does have its own rate. In any economy, non‑market economy. Exactly. Let's assume for purposes of argument that Clevenger Industries here in the United States, I'm a pencil shop. I want to import some case pencils from the People's Republic. And I hear from friends in the business that they tend to import from non‑producing entities, middlemen, some sort of distributor. And so I get the name of one of these distributors from somebody and I call him up over in Beijing. And I say, I want to import some pencils. And I understand that you have never been involved in any anti‑dumping proceedings in your company, but could you please tell me what your anti‑dumping rate is? And they're going to answer my question by telling me what? If they were to talk to those exporters, Your Honor. They consult with their counsel. And they say, what's my anti‑dumping rate? And I think you're getting to the rub of the issue. And they're going to say 110.76. 117B2. And they're going to say the countrywide rate because that's the law from the original proceeding that laid down the anti‑dumping said, hear ye, hear ye. All come, all you can hear, anyone who wasn't in this proceeding who's going to export case pencils from the People's Republic of the United States hereafter is going to have the countrywide rate assigned to them. And what document are you referring to in that regard? Isn't that what happens when notice is given? What notice is given and what's critical in our view in this case is the notice that's provided in the regulations in and of itself. I'm not talking about the regulations. I'm talking about, let's go back to the original anti‑dumping inquiry. When was it? What year did this thing get started? A long, long time ago. Because there have been a couple of administrative reviews, right? And there was an original countrywide rate, whatever it was, right? And for folks that were exporting to the United States after that date, who had not been into the proceeding and gotten their own individual rates, the countrywide rate applied to them. The statute does not specifically state that. And the statute doesn't say one way or the other. So as a result, that's why we're having a conversation about what the regulations state. And what the regulations state are these two provisions in 107, one of which says if the exporter doesn't have its own rate, you refer to, you rely upon the producer's rate. And the other provision, D, simply says, it opens the door, it doesn't say a whole lot, it simply says that for non-market economy countries, you can use a rate that applies to all exporters and producers. Which, by the way, is a concept that rarely, in fact, ever happens in these cases. In fact, I don't know of a case, unless there are cases where every single Chinese exporter and producer has decided not to participate, where the Commerce Department literally has applied a rate to all exporters and producers. Well, what's been going on over history, sir? I mean, this is the first time we've seen this question presented to us. And there have to be, just going on in time, for the longest time, people have been exporting from the People's Republic through non-producing entities. And those goods have been coming in, and they've been subject to anti-dumping duties. Is this the first time the government has ever tried to apply a country-wide rate? Absolutely not, Your Honor. But I think it's important to consider... What I'm trying to get at is whether there's been a consistent practice here, consistent with what I was saying to you, which was my understanding was that if you don't come in to the proceeding initially, or in a review period, and get yourself your own custom-made individual anti-dumping rate, you get the country-wide rate. Your Honor, I understand that. And for those of us who have been practicing this area of law for a long time, that's an understandable interpretation of what happens in commerce policy. It's not enshrined in the statute, and it's not enshrined in the regulation. It's enshrined in commerce policy. Well, it's enshrined in the interpretation of the regulation. My understanding is that the government chooses to interpret that regulation to say that where you're dealing with a non-market economy, then the non-combination rate for the non-producing exporter is the country-wide rate. That's their interpretation of the regulation. If it's been consistent over a long period of years, if there's any ambiguity, I mean, how am I supposed to know what the non-combination rate is? It's not defined. Your Honor, our perspective is that, in fact, the regulation is not ambiguous at all, which is why we're here before you. That, in fact, what it says and what Michaels relied upon Okay, well, we know what a combination rate is because subsection A, isn't it, of the regulation, tells me what a combination rate is. A combination rate is where the producer has his own individual, custom-made rate, and the non-producing exporter, who's not a producer, has his own rate, and they merge them together somehow for a combination rate, right? So we know what a combination rate is. So then we say the regulation speaks of a non-combination rate. Right. And I say, well, a non-combination rate is obviously a rate that wasn't put together by two individuals that had their own custom-made rates and got it blended because that's a combination rate. So a non means it's not that. Right. But what else is it? It's a rate, but just to be clear, Your Honor, a combination rate is a rate that applies to when a producer sells to an exporter, and that exporter then ships to the United States. Okay? That's the combination that matters. The non-combination rate is a rate that would apply to a producer or exporter and that is chosen specifically, that it's assigned specifically to that exporter. Why is that? Well, again, I'm... Why do I necessarily... I see where that leap takes you because it takes you all the way home. You carry the ball across the goal line and get the points, but why should it be that way? And I'm reading directly from the regulatory provision. I'm reading where it says, a combination rate for the exporter in question. The point being that... Where are you? A non-combination. A non-combination rate for the exporter in question. This is in B2. In... The exporter in question just happens to be somebody who's exporting who didn't produce. The exporter in question is a generic thing, not somebody that has a name. It's a creature, a new creature, right, under the regulation, who doesn't manufacture the goods but who's exporting them. That's the one in question. That's right. So, a non-combination rate for that person. And as I say, from the longest time, the commerce has been saying that person had their own rate. It was the countrywide rate. Every single generic, all people with no names attached to them, who, in this case under the regulation, a new person who's exporting but who is not producing has a rate, which is the countrywide rate. Your Honor, I understand that perspective, and obviously that was the Court of International Trade's perspective. It's sort of like a teeter-totter or a fulcrum. Right. That you stand on one end, and your argument tends to carry you where you want to go, and the agency has an argument that tends to take it where it wants to. Of course. And what we're arguing is that their interpretation requires you to make a leap. I didn't see you make it flat out in sort of a Chevron way, but are you saying that their interpretation is unreasonable? Yes. Assuming I found some ambiguity in what a non-combination rate is. Our interpretation is that there is no ambiguity in the regulation. I understand. And therefore, and when viewed through… But why isn't there? Why is it necessary that the non-combination rate for the exporter in question has to be a rate, individual rate in the nature of the rate of somebody who comes into a proceeding and gets vetted and gets their own homemade rate? It is because we are, when you read the language where it says, in that second clause where it says, if the secretary has not established previously a combination rate, dot, dot, dot, or a combination rate for the exporter in question. And when you think about this from the perspective of the importer and from the perspective of Michaels, when they were deciding what to do, they had these producers that produced the pencils that they wanted to bring in. They were talking about somebody who's been, as you can tell from his affidavit, somebody who's been a licensed customs broker since the 1970s. He looks at this regulatory provision, which he thinks is what is gospel here because nothing in the statute tells him which way to go. He reads the regulation and he says, oh, well, these producers that I know the product is coming from have these rates. The exporters do not, but it says if the exporter in question doesn't have its own rate, then you rely upon the producer's rate. Therefore, they think they have this rate, I can live with that rate, I'm going to bring the product in from that company, and the producer's rate is going to comply. And they're sort of oblivious, they don't understand how anti-dumping proceedings have been working over the years with countrywide rates from the People's Republic of China. And the lack of any discussion in the reg with regard to how we do non-market economy cases is the problem. Because there's nothing here. All there is is D, and D doesn't tell us anything. And B doesn't say the way it probably should. In non-market economy cases, or in market economy cases, we don't do that. Now, what about, I know you think the quote, preamble of the regulation is subversive literature, and to be ignored. But it's actually the explanation that the agency was giving when it promulgated its regulation. And isn't there some support in the quote, preamble for the position of the government saying we treat non-market economies a little differently? There is support for that, Your Honor. There's also support. So if this smart fellow who figured out how you were going to get the lower rate of the producer here by this interpretation, they're taxed with needing to read the preamble. And we're going to rely on regulation. You've got to read what's behind the regulations and see whether maybe it doesn't exactly say what you think it says. But if the plain meaning is clear, then the preamble is irrelevant. If we find that it's not clear, and we find that it's ambiguous, then would you next argue that what Congress has said in the Federal Register notice, in its Commerce Policy Bulletin, is unreasonable? In its reading of 107? We would say that you're raising both the preamble as well as the policy bulletin, right? Right. Because to me, they together express, both individually and together, a particular understanding of how this regulation operates, which is when it comes to an exporter from a non-market economy, if they don't have their own separate rate, they're going to be paying the countrywide rate. Understood that that is what you get from, if you understand the variety of decisions that have issued from the Commerce Department over the course of the last 20 years or so. Right. So just so I understand, your argument today is that this regulation is unambiguous. That's right. And you're not making a secondary argument that, well, if the court deems the way this regulation works to be ambiguous, well, we have a fallback argument, which is their interpretation over the course of many years is just simply unreasonable. We have discussed in our briefs that to the extent the court were to determine that the language is ambiguous, we think that their interpretation is not entitled to the deference that they think it's entitled to. Why is that? Is that because of the preamble argument? The preamble in and of itself, again, is rife with lack of clarity. Very good discussion. Let's give deference to maybe the full sweep that it's entitled to. The agency, this looks like a case of first impression to me. We've never seen an argument like this before. Very interesting case. Very interesting problem of the regulation. The government is announcing its interpretation through its voice in the litigation, which is legit, as you know, unless you think that the agency has cooked up an interpretation solely for purposes of the litigation. Right? The Supreme Court has given us some guidance in terms of saying when it is that we can listen to what the government is telling us in the course of the litigation, expressing its interpretation of its own regulation. I agree, but I agree with that to a point, but I think, again, we're kind of leaping back and forth here between unambiguous and ambiguous, but to the extent we're talking about unambiguous language, the Supreme Court has also said it is not the court's job to, I mean, I think, I appreciate your candor and agrees. If this statute, if this regulation is unambiguous and that a non-combination rate for the exporter in question means an individualized, customized rate that that exporter got by going in and asking for it, if that's the plain meaning, you clearly win. But if there's ambiguity, then I think what judge Chen was asking, what I'm asking is what's the breadth of what we can look at for purposes of appreciating and understanding the government's interpretation of its own regulation. Because I mean, the government gets once, once you get to ambiguity, you've got problems simply because historically we do give deference to an agency's interpretation of its own regulation, even more so than we do an agency's interpretation of a governing statute. Of the statute, yes. I understand. In this instance, you know, again, we've talked about whether it's ambiguous or not. Our view is that it's unambiguous, that this non-combination rate is a company specific concept to the extent it was, it is ambiguous that that gets muddier. But I will also tell you that I draw your attention to the preamble to the extent we're, we're forced to look at it because of any sense of ambiguity. And there are, there's even an instance in, in, in the preamble on page 27303 of the, of the preamble in which the commerce department talks about what happens in non-market economy cases where it says in those, another instance in which the department assigns rates to exporters is in 80 investigations and reviews of imports from non-market economy countries. In those cases, if sales in the United States are made through an enemy trading company, we assign a non-combination rate to the trading company regardless of whether the enemy producer supplying the trading company has knowledge of the destination of the merchandise. The point is that they're talking about, they're not about this concept of a countrywide rate. They're talking about the specific instance in which a, a specific rate is assigned to a specific company, which again, didn't happen here. So the point is that this, if you read this preamble, you can read the preamble. It's the preamble is far less clear in, in, in my opinion, as compared to what the plain language of the regulation in itself says. Okay. We're well over your time, so I don't want to hear from the government. And will we store a couple minutes for rebuttal? Thank you. Just seeing if you need more time, that would be, try to even things out. Good morning. Why don't you start where your adversary left off? Because that provision of the regulation that he was reading to us had caught my eye. The provision of the regulation, you mean paragraph B2? No, we're talking about, I'm talking about in the, the preamble upon which you place a lot of emphasis. Paragraph discards another instance. You heard what he was talking about. Yes. Are you familiar with that? This is an instance where they actually assign an actual rate to the middleman. Well, that's correct. But you only assign an actual rate to the middleman once it is established independence from state control. And that's also made clear elsewhere. Is that what that says? Well, the middleman. I mean, I'm just, have you got the language that he was talking about? If sales to the United States are made through an MME company, we assign a non-combination rate to the trading company, regardless of whether the person supplying has knowledge of the destination. That's the sentence I believe that your adversary is pointing to. That's correct, but that only occurs once the trading company has established independence from government control. And in fact, the preamble was issued about the same time. So what you're saying is we assign that rate if somebody comes in and asks for it? That's correct. You still have to establish independence from government control. And if you look at the plain language of the regulation, paragraph B-2, the first two words are new supplier. You can just go back to the preamble language. I think as Mr. Knightly points out, it doesn't quite so clearly say, in these kinds of situations, we're going to assign the countrywide rate to the exporter. It doesn't quite say that, does it? It says, no, we're going to assign a non-combination rate to this non-trading company. Well, I don't have the entirety of it in front of me, but that particular sentence doesn't say that. Why don't you have the entirety of it in front of you? Because we only cited a small portion of it. And you didn't bring the preamble with you? You didn't come prepared for argument? No, Your Honor, I believe I am very well prepared for argument. You didn't bring the document? The section of the preamble states here, I have the pertinent paragraph in my brief. You're now choosing which is the pertinent paragraph? And this is, it states, another instance in which commerce assigns rates to exporters is in investigations and reviews of imports from non-market economies. In those cases, if sales to the United States are made through an NME trading company, we assign a non-combination rate to the trading company, regardless of whether the NME producer supplying the trading company has knowledge of the destination of the merchandise. But that's irrelevant, because before you even get to that part of the preamble, you have to establish independence from government control. And in fact, Michaels was clearly on notice of that fact through 20 years of proceedings with respect to pencils, through commerce's actual policy from the Sparklers case in 1991, through this court's opinions in Sigma and in Transcom, and likewise, returning to the plain language. Well, come and look at the last sentence in that paragraph that you've been reading to me from. It says, nothing in 351.107.b.1 is intended to change our policy for assigning rates in NME proceedings. So are you telling me that it was the policy before then to apply a countrywide rate to someone who had not come in and asked for his own individual rate? That's exactly it, and that's the policy that was first established in the Sparklers case in 1991, and which this court sustained in Sigma in 1997. Was the Sparklers case cited in the regulation? I didn't remember seeing that. It's cited in our brief, and it was published in the Federal Register. No, but it's not cited in the preamble to the regulation. Who besides folks in the department knew? You heard my question to your adversary when he got up, and I called on the telephone and said, by the way, what's your anti-dumping rate? Well, all exporters should know, and in fact, the initiation notices for both administrative reviews that issue in this case stated, and I'm quoting, to establish whether a firm is sufficiently independent from government control of its export activities to be entitled a separate rate, the department analyzes each entity exporting the subject merchandise. Entities that do not have a separate rate from a completed segment of the proceeding should timely file a separate rate application, and that's at pages A88 and A134. Those were both published in the Federal Register and under the Federal Register Act. And is there a statement in there that says if you don't have an individual rate, you get the countrywide rate? That is the agency's policy that had been published. That had been published? That had been published in the Federal Register in Sparklers and in numerous other determinations and where the countrywide rate was imposed on all non-reviewed exporters. So it's clear that Michaels was on notice as to what its exporters would get. And not only that, the regulation itself is very clear. As Mr. Nicely noted, Section B2 applies when the exporter doesn't have its own rate. Those were his exact words during argument. That's what a new supplier would be. Well, here, Michaels' exporters presumptively already had their own rate. That was the China-wide rate. They were simply another appendage of the China-wide entity because they had not established entitlement to a separate rate. Therefore, they were not new suppliers whose rates could be determined under B. Now, if they had gone to the Department of Commerce and asked for a separate rate and demonstrated independence from government control, then they could have obtained a separate rate. Wouldn't there then be a combination rate? They could have obtained a combination rate. What would have happened then? I mean, let's assume that the person that actually sent it to them had a rate of... say the producer had a rate of 1%, hypothetically, and that the middleman had an individual rate of 3. Then what rate would apply? Well, Commerce could determine either a combination rate where it would... Does Commerce get to choose? The parties brief and argue for different rates during the course of a Commerce proceeding, and then Commerce makes its determination under the regulation. If you have under this regulation where you have an individually custom-made assigned rate for both the producer who is not the exporter and the exporter who does the exporting, then Commerce is the one that gets to decide whether to meld those rates into a composite, to a combination? Possibly, and part of the reason for that is that one exporter might sell merchandise from a bunch of different producers that are subject to the order, might sell to a bunch of different importers, so Commerce might also impose importer-specific rates. So the number of permutations here grows exponentially. It seems to me that the case resolves itself right down to the ambiguous, non-ambiguous argument that your adversary has made based on the regulation. The question is, what's a non-combination rate for the exporter in question? Established by the Secretary. Established by the Secretary. The non-combination rate here is the China-wide rate. Well now, why? Say, established by the Secretary. The Secretary established the China-wide rate. For this exporter in question, doesn't mean your adversary's argument is that's talking particularized language. Well, the exporter in question is simply another appendage of the China-wide entity. In fact, if I wave with my right hand or wave with my left hand, it's the same person waving. And that's exactly... That's what you're saying. I mean, what I'm trying to get at is whether or not there is ambiguity here. I mean, you're arguing that the regulation on its face, just throw away the preamble and throw away your policy. And just bring the regulation up and put it on the table. Is your argument that the regulation on its face is perfectly clear? Yes, it's perfectly clear. The non-combination rate has to be the country-wide rate. In this case, yes. No, no, not in this case. It's just pure analysis of the regulation, stripped away from any background noise at all. Well, no, it has to be a rate... A non-combination rate could have actually been imposed... It's in a regulation that talks about creating a combination rate, and the combination rate is created when you have individual rates custom-made for the two people you're going to combine, or the two or three people. That's what a combination rate is, right? Right. So then you talk about a non-combination rate, and your mind says, well, the non-combination rate isn't going to be combined, but maybe it's like the combination rate in that it's particular and specific to the party you're looking at. That's a matter of linguistic interpretation of the regulation. Well, as we... That interpretation, we believe, is not plausible. Well, but you give me that much, just in working with the words. Assuming... Then that begins to suggest that, oh, there maybe is something to that argument. And then you come in from the other side and say, oh, no, no, no, no, Judge, you're just wrong. Everyone, everyone in the class, everyone in the audience agrees with me that non-combination rate means a generic countrywide rate that has no face, no name on it at all. And that's correct, because it's a rate that is not a combination rate. And there could be rates that are not combination rates that were imposed in the case where commerce actually reviewed an export, but there could also be a particular company, say. But there could also be that rate for where commerce reviewed the China-wide entity of which Michael's exporters were simply appendages. And to the extent there is ambiguity, the only real reasonable way to interpret the regulation would be in accordance with the policy and with this court's opinions in SGMA and TRANSCOM where the court approved of that policy. Isn't your strongest case to say, well, maybe there is some ambiguity in the regulation, but look how we've been applying this over all these years. And we have all these worries. We have all these worries about what will happen to the good old United States and to our economy if you allow the non-producing exporter to hive off and live off of a rate of a low producer who never exports anything into the United States. It's all just domestic, right? Your whole policy argument is built upon having a prophylaxis to deal with the situation of jiggering around to get goods into the United States where there should have been and I don't think there is. Right, that's absolutely true. And so to the extent you have to... To the extent you conclude that the regulation is ambiguous as opposed to unambiguously supporting the government's position, really the only reasonable interpretation of the regulation would be to foster accuracy and to prevent the injury caused by... But part of your argument also, if you gave in to ambiguity and relied on policy, is there's nothing unfair here. The non-producing exporter has known for years that they're going to get stuck with this country-wide rate. If their individual rate is lower, all they have to do is come in on the review period and put up their hand, right? That's absolutely true. Because they're going to give me a nice low rate. There's absolutely nothing unfair here. And the exporters here, and in fact even Michaels is an importer, which is an interested party, had the opportunity to ask for a review and obtain separate rates for the exporters, but they elected not to. To what extent is your position in your red brief inconsistent with the CIT's analysis? Do you agree with everything the CIT says? Yes, we do. And there was inartful wording in maybe two places in our brief where we talked about trading companies and where we discussed the non-combination issue. And part of the reason for that was the agency never really made an underlying determination. But looking at the context of the regulation and the plain language of the regulation, for example, the non-combination rate issue, we believe that the regulation is unambiguous that non-combination rates are something that's not a combination. If I could be a little more specific, I think I saw the CIT opinion as trying to flex in D into B2 and understanding how to resolve the case here, whereas I thought I saw your red brief focusing more exclusively just on D and saying let's not even worry about consulting B2 because B2 is for new suppliers and let's just focus on D, which is really about what do you do with anti-dumping duties in relation to a non-market economy. No, we might have been a little more aggressive about D, but the trial court did conclude that Section D really informs any analysis of the entire regulation and you have to look at both provisions together. And Section D is the authority under which commerce applies its non-market economy policy as approved by this court in SGMA and TRANSCOM. When you're talking about cases like SGMA and TRANSCOM, you're talking about federal register notices here and there that are expressing some particular policy about what do you do with a non-producing exporter in a non-market economy. Do any of those policy statements really connect the expression of a policy to the words of this regulation? Did it serve as truly an interpretation of the regulatory language? Besides the... I'm unaware of issues other than the preamble, which we've already discussed, where commerce would say, well, under Section 107 of the regulations, here's how we're going to apply it. But instead, commerce made its policy very clear and going back to Judge Clevenger's question about if you called up a producer in Beijing who's never exported to the United States before and asked him or her what the rate would be, you would get an answer, well, the China-wide rate, at least until the exporter went and got its own rate. And that's something that parties have been on notice of for more than two decades, and that's also something that's completely fair. Thank you. Here we are. Thank you. Mr. Knightley? You have a few more minutes. Let me finish by drawing the Court's attention to this issue of what, in fact, a company like Michaels has notice of. Again, an official at Michaels as the one that drafted the affidavit that is in our materials shows that as it is his understanding of reading the regulations, which you would expect somebody who is a licensed broker to do, to read those regulations and say, okay, the folks who I'm buying from are going to be subject to something different. Am I on notice that I need to request a review for these additional exporters? And in fact, when you read that regulation, it says, no, I rely on the producer's rate. And if you think about it from the perspective of somebody who's not steeped in these years of the anti-dumping rules with regard to non-market economies, which may make perfect sense to all of us, the folks in this room, it doesn't make perfect sense to everybody else who's out there outside the beltway. The question is, what does the regulation say? And the regulation was very clear, is very clear, that in fact, what you do in this instance is you rely upon the producer's rate. Now, that's an interesting question that you raise, and I don't know the answer to it, which is to say, what is it that a reasonable importer is supposed to look at to decide what a regulation means? If I were to put this in the patents law context, I would say to this reasonable person, you have to go get the patent, and then when you think you know what the patent means, you have to get what's called the file history of the patent, and then you have to read the whole file history of the patent to see how all their arguments were made to come up with what the meaning of the patent is. So, I mean, I don't know the answer to your question. Then you've got to read our case law, too. Yeah, and then you're basically charged with the knowledge of everything that's out there before you say, oh, I know what a regulation means. Now, in the context of patent law, we've been doing it from time immemorial. No one's ever complained, but I don't know what the answer is in a custom setting. And what I'm suggesting is the answer is that in this context, where, and again, there is, as you all know far better than I do, the extent of the case law, the federal court case law, that suggests that we're not to step in and create alternative regulatory provisions where the language is already clear. Thank you, counsel, the case is submitted.